# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TAMEKA RICHARDSON, as NEXT FRIEND OF N.D., a minor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N18C-10-026 JRJ |
| CHRISTIANA CARE HEALTH SERVICES, INC., | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  March 25, 2021
Date Decided:  June 21, 2021
Date Corrected:  December 6, 2021*

*Upon Plaintiff's Motion in Limine to Exclude Causation Testimony from Dr. Neil Silverman and Dr. Harold Wiesenfeld – **GRANTED***

*Upon Plaintiff's Motion in Limine to Limit Cumulative Expert Testimony – **DENIED***

*Upon Plaintiff's Motion in Limine to Limit Neil Silverman M.D.'s Testimony Regarding Standard of Care – **DENIED***

*Upon Plaintiff's Motion in Limine to Limit Dr. Coleen Cunningham's Testimony Regarding the Standard of Care – **MOOT***

*Upon Plaintiff's Omnibus Motion in Limine – **GRANTED IN PART AND DENIED IN PART***

Timothy E. Lengkeek, Esquire, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attorney for Plaintiff.

Joshua H. Meyeroff, Esquire, Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attorney for Defendant.

**Jurden, P.J.**

\* The Court corrected a typographical error in footnote 71.

# I. INTRODUCTION

Serving as next friend of her grandson ("N.D."), Plaintiff Tameka Richardson filed this medical negligence action against Defendant Christiana Care Health Services ("CCHS"). N.D.'s mother was infected with HIV while she was pregnant with N.D., and the virus was transmitted to N.D. Plaintiff alleges that this transmission occurred because CCHS—by and through its obstetric agents and employees—negligently failed to retest N.D.'s mother for HIV at 36 weeks, so it did not know that N.D.'s mother had been infected with the virus during pregnancy. Plaintiff has filed five Motions *in Limine* asking the Court to make various evidentiary rulings ahead of trial;[1] the Court addresses these Motions below. CCHS has filed two Motions of its own,[2] which the Court will address separately.

# II. DISCUSSION

**A.    Plaintiff's Motion *in Limine* to Exclude Causation Testimony from Dr. Neil Silverman and Dr. Harold Wiesenfeld[3]**

Plaintiff asks the Court to exclude Dr. Silverman's and Dr. Wiesenfeld's testimony that N.D. was infected *in utero* rather than during the intrapartum period (i.e., during delivery).[4] In support of this request, Plaintiff first points to testimony

---

[1] Trans. ID 65946740; Trans. ID 65946477; Trans. ID 65946338; Trans. ID 65946141; Trans. ID 65946227.
[2] Trans. ID 65863005; Trans. ID 65863041.
[3] Trans. ID 65946740.
[4] *Id.* at ¶ 2.

provided by CCHS's own pediatric infectious disease expert, Coleen Cunningham, M.D.[5] Dr. Cunningham testified that (1) it is impossible to know whether N.D. was infected *in utero* or during delivery, and (2) it is unknown whether the timing of a mother's HIV infection (i.e., before or during pregnancy) affects the timing of HIV transmission to the baby (i.e., *in utero* or during delivery).[6]

Plaintiff argues that Dr. Silverman's and Dr. Wiesenfeld's testimony contradicts Dr. Cunningham's testimony—and does so without an adequate basis in the literature.[7] During his deposition, Dr. Silverman testified that the fact that N.D.'s mother had been infected with HIV during pregnancy made it statistically more likely that N.D. had been infected *in utero* rather than during delivery.[8] Dr. Silverman stated that he based that opinion on data from the CDC and NIH and pointed to the textbook *Pediatric Infectious Disease* for additional support.[9] After Dr. Silverman's deposition, CCHS's counsel produced six documents, which, according to Plaintiff, "do not support Dr. Silverman's testimony that it is statistically more likely N.D. was infected in utero because his mother's infection occurred during pregnancy."[10] Next, Dr. Wiesenfeld testified as follows:

---

[5] *Id.* at ¶ 3.
[6] *Id.*
[7] *Id.* at ¶ 4.
[8] *Id.*
[9] *Id.*
[10] *Id.* at ¶ 5 (emphasis omitted).

> Acute HIV infection in pregnancy is a very – is a time of extremely high risk of transmitting the virus to the baby, a far greater chance than if somebody was infected before the pregnancy and came into pregnancy with an HIV-positive diagnosis.[11]

Plaintiff contends that this was merely Dr. Wiesenfeld's opinion; Dr. Wiesenfeld has never had a patient become infected with HIV while pregnant.[12] And in support of his opinion, Plaintiff continues, Dr. Wiesenfeld cited a single study, which, in Plaintiff's view, "in no way supports Dr. Wiesenfeld's opinion." In sum, Plaintiff argues that Dr. Silverman's and Dr. Wiesenfeld's causation testimony amounts to *ipse dixit*, contradicts Dr. Cunningham's testimony, and is not supported by the literature.[13]

In response, CCHS first argues that Dr. Silverman and Dr. Wiesenfeld are qualified to give opinion testimony under the *Daubert* standard and Delaware Rule of Evidence ("D.R.E.") 702.[14] Because medical testimony need not be produced for a qualified expert to give opinion testimony, CCHS maintains, Plaintiff's contentions about the underlying literature are misplaced.[15] Next, CCHS argues that Dr. Silverman and Dr. Wiesenfeld should not be prohibited from testifying simply

---

[11] *Id.* at ¶ 7.
[12] *Id.*
[13] *Id.* at ¶¶ 6, 8.
[14] *See* Trans. ID 65976880, at ¶¶ 2–3 (first citing *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006); and then citing D.R.E. 702).
[15] *Id.* at ¶ 4 (citing *Wong v. Broughton*, 204 A.3d 105, 109 (Del. 2019)); *id.* at ¶ 4 n.8 (citing *Norman v. All About Women, P.A.*, 193 A.3d 726, 731 (Del. 2018)) ("Regardless, medical literature is not necessary for admissibility of their expert opinions.").

4

because their testimony contradicts Dr. Cunningham's.[16]  Rather, all three experts should be allowed to testify, leaving it to the jury to assign weight to each expert's testimony.[17]

The Court will exclude Dr. Silverman's and Dr. Wiesenfeld's testimony as to the issue of causation.  The specific causation testimony that Plaintiff takes issue with is the doctors' shared opinion that when a mother is infected with HIV during pregnancy, the risk that her baby will be infected with HIV *in utero* is greater than 50%.[18]  The Supreme Court of Delaware has decided that such statistical claims cannot be used to negate proximate cause in a particular case.[19]

In addition, Dr. Silverman and Dr. Wiesenfeld expressly stated that their statistical claims were based on the literature—not their personal experience.[20]  The

---

[16] *See id.* at ¶¶ 5–6.

[17] *Id.* at ¶ 6.

[18] *See* Dep. of Dr. Silverman, Trans. ID 65946740 (Ex. A), at 48:7–9 (emphasis added) ("[A]cute, primary maternal infection during a pregnancy, especially the third trimester, puts the risk of fetal infection at *at least 50 to 75 percent*."); Dep. of Dr. Wiesenfeld, Trans. ID 65946740 (Ex. D), at 45:3–9 (emphasis added) ("But looking at perinatally-infected individuals, of babies, when you look back at them, a high proportion of them, perhaps *more than half*, have been deemed to be acquired in utero, that is before the intrapartum process").

[19] *Pruett v. Lewis*, 2011 WL 882102, at *2 (Del. Super. Ct. Mar. 10, 2011) (citing and quoting *Timblin v. Kent General Hospital*, 640 A.2d 1021 1024–26 (Del. 1994)).  At oral argument, Plaintiff clarified that this is the precise testimony that she wishes to exclude.  Transcript of March 25, 2021 Hearing, at 13:15–22 (Trans. ID 66654931) (Mr. Lengkeek: "[T]his testimony[,] the 50 to 75 percent of moms pass it on in utero when they get HIV[,] is not truthful. . . . But the Court, as the gatekeeper, should decide under Daubert[,] under its prior decisions[,] and under Delaware Rule of 102 that this testimony not be permitted to be given to the jury.").

[20] Dep. of Dr. Silverman, Trans. ID 65946740 (Ex. A), at 45:2–13 ("Q. All right.  Are you going to offer an opinion that the fetus was infected prior to 36 weeks?  A. Statistically, it's more likely.  Yes, it was already infected.  Q. What do you base that on?  A. So I base that on fairly well-established data cited by the CDC and the NIH on their publicly available websites that acute HIV

literature produced, however, does not contain the 50–75% statistic that Dr. Silverman cites—a point that CCHS's counsel has conceded.[21]  And the study that Dr. Wiesenfeld relied on for his opinion appears not to support the idea that a mother's infection with HIV during pregnancy can show when her baby was infected.[22]  In fact, the researchers involved in the study could not determine when mother-to-baby transmission occurred in most cases; this conclusion supports Dr. Cunningham's position.[23]

infection during pregnancy, especially in the third trimester, increases the risk of fetal transmission by a factor of two or three fold.  That's based on numerous pre anti-retroviral therapy studies done across the globe."); Dep. of Dr. Wiesenfeld, Trans. ID 65946740 (Ex. D), at 58:1–11 ("Q. Are you relying on any textbooks or any literature to support this specific opinion?  A. Again, I mentioned to you -- again, from what I recall from reading about this topic in the past, that looking at those babies who -- in the UK who were perinatally infected with HIV in the more modern era, the majority of them were infected in utero, that is prior to the onset of labor.").

[21] *See* Transcript of March 25, 2021 Hearing, at 23:1–8 (The Court: "Before you go on.  Before you go on.  Where in the literature, where do you cite me to that has the 50 to 75 percent statistic that Dr. Silverman tallied?"  Mr. Meyeroff: "So they did not cite -- I will be honest, Your Honor, I read the literature as well . . . . .  I didn't see that specific statistic."); *see also id.* at 6:23–7:6 (Mr. Lengkeek: "I said, okay, I need to see those studies.  Mr. Meyeroff provided me with those studies. . . . I have reviewed all of those studies.  None of those studies, none of them state[s] that the risk of in utero transmission is 50 to 75 percent when mom gets HIV while she is pregnant.").

[22] Transcript of March 25, 2021 Hearing, at 10:19–11:3 (Mr. Lengkeek: "So there [are] 67 babies born [out of the 100 babies examined] with unknown HIV status. They found out down the road, just like they found out in this case, down the road, that the baby got HIV from his mother. In that case the timing of HIV acquisition could not be estimated for nearly 90 percent of those 67 children. So this article does not help Dr. Wiesenfeld. In fact, it helps us.").  CCHS's counsel did not rebut this interpretation of the study.

[23] *Id.*

Finally, it is true, as CCHS argues, that supporting literature is not a prerequisite under *Daubert*.[24] Nor is supporting literature listed among the reliability factors that the Supreme Court of Delaware identified in response to *Daubert*:

> (1) the witness is qualified as an expert by knowledge, skill, experience, training or education; (2) the evidence is relevant; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert will assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[25]

The doctors' statistical opinions do, however, run afoul of factor (5) above because they risk misleading the jury; they invite the jury to infer that any alleged negligence could not be the proximate cause of the injury in this case because that injury was statistically likely to happen anyway.[26] And even if the experts' opinions were to check all of *Daubert*'s boxes, that would not necessarily guarantee their admissibility.[27] The trial court must use its "broad latitude" to determine whether "*Daubert*'s specific factors are, or are not, reasonable measures of reliability in a

---

[24] *See* Trans. ID 65976880, at ¶ 6.

[25] *Norman v. All About Women, P.A.*, 193 A.3d 726, 730–31 (Del. 2018).

[26] *Timblin v. Kent General Hospital*, 640 A.2d 1021 1024–26 (Del. 1994); *cf. Crowhorn v. Boyle*, 793 A.2d 422, 433 (Del. Super. Ct. 2002) (noting that the doctor's general "proposition that seventy-five percent of chronic back pain sufferers 'get better' in six weeks . . . would have no application to" the plaintiff because the doctor "offer[ed] no basis for placing [the plaintiff] among the seventy-five percent.")

[27] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1269 (Del. 2013) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593 (1993)) ("The United States Supreme Court has emphasized that those [*Daubert*] factors are not a 'definitive checklist.'").

particular case."[28] Here, the Court finds that Dr. Silverman's and Dr. Wiesenfeld's causation testimony is unreliable due to the absence of supporting literature and the existence of contradictory literature (and testimony).[29] Accordingly, Plaintiff's Motion *in Limine* to Exclude Causation Testimony from Dr. Neil Silverman and Dr. Harold Wiesenfeld is **GRANTED**.

## B.     Plaintiff's Motion *in Limine* to Limit Cumulative Expert Testimony[30]

In this Motion, Plaintiff asks the Court to prevent CCHS "from presenting two experts who will offer identical opinions."[31] Those experts are Dr. Silverman and Dr. Wiesenfeld, both of whom are obstetricians.[32] Plaintiff emphasizes the Court's discretion to limit the number of witnesses that a party may offer to support the same idea.[33] In addition, Plaintiff points to Rule 403, which allows the Court to exclude relevant evidence on grounds such as undue delay, time wasting, and the needless presentation of cumulative evidence.[34] Plaintiff fears that she will suffer prejudice should the Court allow both Dr. Silverman and Dr. Wiesenfeld to testify.[35] She

---

[28] In addition, the Court must construe the Delaware Rules of Evidence—including Rule 702, which governs the admissibility of expert testimony—so as to pursue "the end of ascertaining the truth." D.R.E. 102.

[29] *See Crowhorn*, 793 A.2d at 433 (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593 (1993)) ("*Daubert* requires that the expert's reasoning be both scientifically valid and applicable to the facts of the case.").

[30] Trans. ID 65946477.

[31] *Id.* at ¶ 1.

[32] *Id.*

[33] *Id.* at 2 (citing *Fromal v. George*, 2004 WL 65334 (Del. Jan. 7, 2004)).

[34] *Id.* (citing D.R.E. 403).

[35] *See id.* at ¶ 3.

argues that that the jury will assign the doctors' shared opinion greater weight after hearing it twice.[36]

CCHS responds that Delaware law permits a party to present the testimony of two experts who practice in the same field.[37] And CCHS notes that, despite their shared field, Dr. Silverman and Dr. Wiesenfeld have different experiences by virtue of their practices.[38] CCHS also contends that Dr. Silverman and Dr. Wiesenfeld will serve partially distinct functions, as each will rebut different opinions offered by one of Plaintiff's experts, Dr. Elizabeth Eden.[39]

The Court will allow the testimony of both Dr. Silverman and Dr. Wiesenfeld. The Supreme Court of Delaware has made clear that "the fact that evidence may be cumulative does not render it inadmissible."[40] With respect to Rule 403, the Court

---

[36] *See id.*

[37] Trans. ID 65977063, at ¶ 1; *see id.* at ¶ 2 (first quoting *Barrow v. Abramowicz*, 931 A.2d 424, 430 (Del. 2007); and then quoting *Green v. Alfred A.I. DuPont Inst. of the Nemours Found.*, 759 A.2d 1060, 1065 (Del. 2000)).

[38] *Id.* at ¶ 6 (noting that Dr. Silverman, among other things, is a private practice physician and is board certified in maternal fetal medicine, whereas Dr. Wiesenfeld, among other things, practices at a teaching hospital and is not board certified in maternal fetal medicine); *id.* at ¶ 8 ("Dr. Wiesenfeld routinely orders HIV testing during pregnancy and delivers babies, whereas[] Dr. Silverman does not currently routinely do either.").

[39] *Id.* at ¶ 1.

[40] *Barrow v. Abramowicz*, 931 A.2d 424, 430 (Del. 2007); *accord Galmore v. St. Francis Hosp.*, 2011 WL 2083888, at *2 (Del. Super. Ct. Apr. 27, 2011) (quoting *Barrow v. Abramowicz*, 931 A.2d 424, 430 (Del. 2007)) ("[T]his Court should limit a party's presentation of evidence on the ground that it is cumulative 'only sparingly.'"); *DeBussy v. Graybeal*, 2016 WL 8379211, at *1 (Del. Super. Ct. Dec. 2, 2016) ("[O]verlapping evidence is not automatically inadmissible."). At the hearing, Plaintiff's counsel attempted to distinguish the relevant cases—those just cited and others—on factual grounds. *See* Transcript of March 25, 2021 Hearing, at 30:10–41:5. But each case contains general—rather than fact-bound—statements to the effect that cumulative evidence should not automatically be excluded.

"has been cautioned against excluding cumulative evidence too freely [under Rule 403] and informed that overlapping evidence is not automatically inadmissible."[41] Also, if Dr. Silverman and Dr. Wiesenfeld each rebut a different aspect of Dr. Eden's testimony, then each expert's testimony will have independent probative value; and if evidence has probative value, then there is a heavy presumption in favor of its admissibility under Rule 403.[42] Finally, with respect to the potential for prejudice to Plaintiff, the Court has noted that "[e]ven if [two] doctors largely duplicate one another's testimony, duplication does not equal prejudice."[43] In addition, the jury will be instructed that "[p]reponderance of the evidence does not depend on the number of witnesses."[44]

That said, the Court will not allow "piling on." The causation opinions of these two experts are virtually identical. The differences are their specialties and experience. The Court expects that on direct examination, CCHS will not spend an inordinate amount of the jurors' time and attention eliciting from both experts a

---

[41] *DeBussy v. Graybeal*, 2016 WL 8379211, at *1 (Del. Super. Ct. Dec. 2, 2016).

[42] D.R.E. 403 (emphasis added) ("The court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[43] *DeBussy*, 2016 WL 8379211, at *2.

[44] *Superior Court Civil Pattern Jury Instruction 4.1.*; *see also DeBussy*, 2016 WL 8379211, at *2 ("The jury will be instructed not to give more weight to one side's evidence simply because that side has presented a greater number of experts or witnesses. Therefore, [the plaintiff] will not be unfairly prejudiced by the fact that [the defendant] will present two expert witnesses compared to her one witness.").

10

lengthy explanation as to causation. D.R.E. 403 still applies, and there does come a point when the number of experts and the duration of their explanations of identical opinions becomes unfairly prejudicial to the other side.[45] Consequently, Plaintiff's Motion *in Limine* to Limit Cumulative Expert Testimony is **DENIED** without prejudice.

**C.** **Plaintiff's Motion *in Limine* to Limit Neil Silverman M.D.'s Testimony Regarding Standard of Care[46]**

In this Motion, Plaintiff seeks to exclude Dr. Silverman's testimony about the applicable standard of care.[47] According to Plaintiff, the alleged breach in this case is the case is the failure of CCHS's obstetric agents—a number of nurse practitioners—to appropriately test N.D.'s mother for HIV.[48] Plaintiff argues that Dr. Silverman is not qualified to speak to this issue because he is a maternal fetal medicine physician who has not provided obstetrical care since 1997.[49] Indeed, Plaintiff continues, Dr. Silverman conceded that the standard of care has changed since he last provided obstetrical care.[50] And now that he is a maternal fetal medicine physician, Dr. Silverman no longer orders HIV testing or screening for expectant

---

[45] Yes, there is a curative instruction, but, as gatekeeper, the Court must exercise its discretion to ensure a fair trial.
[46] Trans. ID 65946338.
[47] *Id.* at ¶ 2.
[48] *Id.* at ¶ 1.
[49] *Id.* at ¶ 2.
[50] *Id.* at ¶ 3.

mothers.[51] Plaintiff avers that Dr. Silverman testified that no national standard of care exists for such testing or screening and that he is not qualified to offer an opinion about the standard of care for nurse practitioners providing obstetrical care in Wilmington, Delaware.[52]

CCHS responds that Dr. Silverman should be able to testify as to whether CCHS's obstetrics providers appropriately tested or screened N.D.'s mother for HIV.[53] CCHS points out that, in addition to being a maternal fetal medicine physician, Dr. Silverman is board certified in obstetrics and gynecology and that he has been recognized as a national expert on HIV testing during pregnancy.[54] Further, CCHS notes that Dr. Silverman was on the American College of Obstetricians and Gynecologists ("ACOG") committee that published ACOG Committee Opinion 752.[55] This is significant, according to CCHS, because Plaintiff's own standard-of-care expert, Dr. Eden, conceded in her deposition that ACOG Committee Opinion 752 articulates the standard of care that applies in this case.[56] CCHS also argues that Plaintiff misleadingly characterizes Dr. Silverman as a maternal fetal medicine physician rather than an obstetrician because maternal fetal medicine is a

---

[51] *Id.*
[52] *Id.*
[53] *See generally* Trans. ID 65977202.
[54] *Id.* at ¶ 1.
[55] *Id.* at ¶ 2.
[56] *Id.* at ¶ 3; *id.* at ¶ 5.

subspeciality of obstetrics and gynecology.[57] Finally, CCHS charges Plaintiff with misconstruing Dr. Silverman's testimony.[58] According to CCHS, Dr. Silverman did not testify that there is no national standard for HIV screening during pregnancy; rather, the testimony that Plaintiff refers to "concerns rescreening protocols for other sexually transmitted diseases such as chlamydia and gonorrhea."[59]

The Court will allow Dr. Silverman to testify as to the standard of care. Dr. Silverman has relevant qualifications, in part because he was "on the committee that helped review and edit" ACOG Committee Opinion 752, which addresses prenatal and perinatal HIV testing.[60] Plaintiff and CCHS agree that ACOG Committee Opinion 752 does not itself constitute the standard of care.[61] But that does not bar Dr. Silverman from testifying about that publication for purposes of establishing the standard of care. As the Supreme Court of Delaware has stated, "It is settled law

---

[57] *Id.* at ¶ 4.

[58] *Id.* at ¶ 6.

[59] *Id.*

[60] Trans. ID 65977202, Ex. C, at 15:9–15. Apart from his involvement with ACOG Committee Opinion 752, Dr. Silverman has substantial expertise in the realm of HIV issues during pregnancy. Trans. ID 65977202, Ex. C, at 10:10–14 (noting that he has been involved with "publications dealing with HIV issues in pregnancy starting in 1992[] and continuing until the present day when [he] was asked by ACOG to be the primary author on . . . Management of Labor and Delivery with HIV Infection," which "was published in 2018").

[61] *See* Transcript of March 25, 2021 Hearing, at 50:9–10 (Mr. Lengkeek: "[T]he document [ACOG Committee Opinion 752] itself says this is not the standard of care."); *id.* at 55:8–17 (The Court: "Mr. Meyeroff, do you agree with that statement, ACOG is not the standard of care? It cannot be used as the standard of care by its own express terminology?" Mr. Meyeroff: "Your Honor, I would say generally yes, but to caveat that Dr. Eden testified under oath that it defines the standard of care in this case. So as a general rule, yes, but their own expert has said this defines how a pregnant woman should be tested.").

13

that the standard of care in a medical malpractice action is established by *evidence* of the degree of care and competence ordinarily exercised by physicians on the same or similar community."[62]  Plaintiff has not provided any authority to suggest that ACOG Committee Opinion 752 cannot constitute "evidence" of the applicable standard of care.  Moreover, Plaintiff's own standard-of-care expert, Dr. Eden, testified during her deposition that ACOG Committee Opinion 752 articulates the standard of care that applies in this case.[63]  If Dr. Eden is qualified to testify as to the applicable standard of care, and if Dr. Eden believes that the standard of care appears in ACOG Committee Opinion 752, then Dr. Silverman should be able to testify as to his understanding of the recommendations in that publication.  To the extent that Dr. Silverman's interpretation differs from Dr. Eden's, that inconsistency would go to the weight of Dr. Silverman's testimony, not its admissibility.  Accordingly, Plaintiff's Motion *in Limine* to Limit Dr. Silverman's Testimony Regarding Standard of Care is **DENIED**.

**D.      Plaintiff's *Motion in Limine* to Limit Dr. Coleen Cunningham's Testimony Regarding the Standard of Care[64]**

During the hearing on these Motions, CCHS's counsel stated the following:

---

[62] *Pruett v. Lewis*, 2011 WL 882102, at *2 (Del. Super. Ct. Mar. 10, 2011) (internal quotation marks omitted and emphasis added) (quoting *Timblin v. Kent General Hosp.*, 640 A.2d 1021, 1024 (Del. 1994)).

[63] Trans. ID 65977202, Ex. E, at 22:22–23:1 ("Q. But is it fair to say that the Committee Opinion 752 is articulating the standard of care that also applied back in 2016?  A. Yeah.").

[64] Trans. ID 65946141.

14

> To the extent that [CCHS is] able to call [Dr. Wiesenfeld and Dr. Silverman] to address the standard of care issues, [CCHS] would not offer Dr. Cunningham to address standard of care. . . . . [I]f that makes it easier for Your Honor we can probably moot this motion.[65]

Plaintiff has not sought to exclude Dr. Wiesenfeld's testimony regarding the standard of care, and the Court will allow Dr. Wiesenfeld to testify as to that issue. As for Dr. Silverman, the Court has concluded he will be allowed to testify as to the standard of care. According to CCHS's representation, then, CCHS will not call Dr. Cunningham to testify regarding the standard of care. Accordingly, Plaintiff's Motion *in Limine* to Limit Dr. Coleen Cunningham's Testimony Regarding the Standard of Care is **MOOT**.

### E. Plaintiff's Omnibus Motion *in Limine*[66]

#### 1. Comparative Negligence

Plaintiff (N.D.'s grandmother) seeks to exclude any evidence or argument that she or N.D.'s mother was comparatively negligent.[67] As for N.D.'s mother, the crux of the comparative negligence issue is whether she would have complied with her HIV treatment plan had CCHS retested her when she was 36 weeks pregnant and

---

[65] Transcript of March 25, 2021 Hearing, at 60:7–14.
[66] Trans. ID 65946227.
[67] *Id.* at ¶ 1. As CCHS clarified, however, it does not seek to show that Plaintiff was comparatively negligent; rather, it seeks to use evidence of Plaintiff's conduct to show that she failed to mitigate the damages that she could recover should CCHS be found negligent. Transcript of March 25, 2021 Hearing, at 68:23–69:3 (Mr. Meyeroff: "So if the grandmother learned of it earlier, but delayed treatment, that impacts the child's condition[,] the life-care plan[,] and the damages claim."); *id.* at 71:19–20 (Mr. Meyeroff: "For the grandmother issue, that would be for damages.").

had that retest resulted in a positive diagnosis. CCHS argues that N.D.'s mother would have been noncompliant with her HIV treatment.[68] In support, CCHS points to evidence that N.D.'s mother had not complied with certain recommendations during pregnancy or with her HIV treatment after she learned that she had been infected.[69] Plaintiff responds that the jury should not be allowed to use this evidence to speculate that N.D.'s mother would have been noncompliant with her HIV treatment had she been diagnosed during pregnancy.[70]

Pursuant to D.R.E. 403, the Court will exclude as unfairly prejudicial any testimony, comments, questions, arguments, or suggestions that N.D.'s mother was comparatively negligent. First, evidence of her prior noncompliance has questionable probative value as to whether she would have been noncompliant again. When N.D.'s mother failed to comply with recommendations during pregnancy, she was not aware that she had HIV; and when she failed to comply with her HIV treatment, she was not pregnant with N.D. Her noncompliance under these circumstances sheds little light on whether she would comply with her HIV treatment during pregnancy, when noncompliance would mean risking transmission of the virus to N.D. And to the extent that evidence of N.D.'s mother's prior

---

[68] Transcript of March 25, 2021 Hearing, at 72:4–18.
[69] *Id.*; *id.* at 73:3–6.
[70] *Id.* at 77:17–78:4.

noncompliance has probative value, the Court finds that it is substantially outweighed by the risk that the jury would use that evidence to speculate that N.D.'s mother would again be noncompliant.[71]

Next, CCHS argues that evidence of Plaintiff's conduct should be admissible to show that Plaintiff delayed or otherwise failed to take appropriate steps in facilitating N.D.'s HIV treatment.[72] CCHS would offer such evidence to show that Plaintiff allegedly failed to mitigate damages.[73] "Failure to mitigate damages is an affirmative defense . . . ."[74] "Generally, an affirmative defense must be pled or the defense is waived."[75] Nonetheless, a "party may amend the party's pleading . . . by

---

[71] In addition, D.R.E. 404(b) prohibits "[e]vidence of a . . . wrong[] or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." D.R.E. 404(b). Although the evidence would invite a *predictive* inference (i.e., suggesting what N.D.'s mother *would have done* rather than what she *in fact did* on a particular occasion), the inference violates the spirit of 404(b), which is to "forbid[] the proponent . . . from offering evidence of . . . misconduct to support a general inference of bad character." *Getz v. State*, 538 A.2d 726, 730 (Del. 1988).

[72] *See id.* at 71:7–71:14; *see, e.g., id.* at 68:19–21 ("The . . . issue is when did [Plaintiff] learn of the HIV diagnosis for [N.D] and what role that may have played."); *id.* at 70:22–71:6 ("[T]here are references in the records that there was difficulty in getting the baby to take the HIV medicine . . . . [T]he delay in treatment impacts the vital load and the growth. And Dr. Bennett agreed if there was a delay in administering the medications, that impacts the growth of the HIV . . . .").

[73] Transcript of March 25, 2021 Hearing, at 71:9–23.

[74] *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *20 (Del. Ch. Ct. Sept. 19, 2017) (internal quotation marks omitted) (quoting *Tanner v. Exxon Corp.*, 1981 WL 191389, at *4 (Del. Super. Ct. July 23, 1981)), *aff'd in part, rev'd in part on other grounds*, *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2018 WL 2966941 (Del. June 11, 2018).

[75] *James v. Glazer*, 570 A.2d 1150, 1153 (Del. 1990) (citations omitted); *see also* Del. Super. Ct. R. Civ. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an . . . affirmative defense.").

leave of court," which "shall be freely given when justice so requires."[76] Whether to grant a motion to amend is "entrusted to the sound discretion of the trial court."[77]

Here, CCHS filed its Answer on November 28, 2018.[78] CCHS did not include Plaintiff's alleged failure to mitigate damages as an affirmative defense. Nor did CCHS move to amend its Answer to include that defense. Indeed, the Court first learned that CCHS intended to raise that defense at the hearing on March 25, 2021. Plaintiff, too, was previously unaware that CCHS intended to raise the defense.[79] For these reasons, the Court will exclude testimony, comments, questions, arguments, and suggestions that Plaintiff failed to mitigate damages by delaying or otherwise failing to take appropriate steps in facilitating N.D.'s HIV treatment.

2. References by Any Expert as to How S/he Personally Would Have Treated the Plaintiff (or a Similar Patient), or How the Expert's Partners or Associates Would Have Treated the Plaintiff

Plaintiff argues that the jury might misconstrue testimony about experts' anecdotal experiences and what they would have done in this case as evidence of the applicable standard of care.[80] Such testimony, Plaintiff contends, should be

---

[76] Del. Super. Ct. R. Civ. P. 15(a).
[77] *State v. Sykes*, 2013 WL 3834048, at *2 (Del. Super. Ct. July 12, 2013) (citing *Mullen v. Alarmguard of Delmarva, Inc.*, 625 A.2d 258, 263 (Del. 1993)).
[78] Trans. ID 62702317.
[79] *See* Trans. ID 65946227, at ¶ 1 (emphasis added) (asking the Court to "preclude testimony, comments, questions, arguments, or suggestions that she [Plaintiff] was *comparatively negligent* in any respect").
[80] Trans. ID 65946227, at ¶ 2.

excluded under D.R.E. 402 and D.R.E. 403; Plaintiff also asserts that such evidence amounts to hearsay.[81] CCHS largely agrees.[82] It maintains, however, that expert testimony should not be excluded if its purpose is to impeach or to demonstrate reasonable alternative medical treatments consistent with the standard of care.[83] But CCHS later states that it does "not intend to argue that there were 'alternative treatments' to screening that should/should not have been employed."[84] So the Court need only clarify that it will allow proper impeachment testimony but will otherwise exclude as unfairly prejudicial any testimony from experts about what they (or their partners or associates) would have done in this case or what they have done with similar patients.

  3. <u>Evidence of Good Character</u>

Because the admissibility of evidence of good character will depend on the way that it is characterized, the Court will defer ruling on this aspect of the Motion until trial. When such evidence is offered at trial, the Court will view it through the lens of D.R.E. 403.

  4. That Defendant's Agents and Employees Exercised a Good Faith <u>Judgment Between Two Appropriate Alternative Medical Treatments</u>

---

[81] *Id.*
[82] Trans. ID 65977132, at ¶ 2.
[83] *Id.*
[84] *Id.* at ¶ 4.

19

Plaintiff argues that CCHS should not be able to avoid liability by showing or attempting to show that it was not negligent because it chose between acceptable alternative treatments.[85] CCHS does not intend to make that argument.[86] So the Court will exclude testimony, comments, questions, arguments, and suggestions to that effect.

5. Uncalled Witness(es)

At the hearing, Plaintiff's counsel limited the scope of his request to "propos[ing] that nobody comments on an uncalled witness before informing the other side or the Court."[87] The parties therefore agree that this issue is best handled at trial,[88] and the Court will defer ruling on it until it arises.

6. Apologies, Condolences, or Sorrow Over N.D.'s HIV Status

Pursuant to 10 *Del. C.* § 4318(b), The Court will exclude testimony, comments, questions, arguments, and suggestions that CCHS is sympathetic or apologetic as to N.D.'s being born HIV positive.[89]

7. Vouching

---

[85] Trans. ID 65946227, at ¶ 4.
[86] Trans. ID 65977132, at ¶ 4.
[87] Transcript of March 25, 2021 Hearing, at 87:7–9.
[88] Trans. ID 65977132, at ¶ 5.
[89] The Court will also ensure that Plaintiff does not attempt "to mislead the jury or appeal to its bias or prejudice." *Deangelis v. Harrison*, 628 A.2d 77, 80 (Del. 1993). "[W]here objection is made, the trial court is obliged to act firmly with curative instructions even where no objection is forthcoming until after summations." *Id.* (citing *Massey-Ferguson, Inc. v. Wells*, 421 A.2d 1320, 1324 (1980)).

The Court will exclude testimony, comments, questions, arguments, and suggestions that CCHS's experts are "the best" or any similar attempt to vouch—except as necessary to establish the experts' qualifications. Accordingly, Plaintiff's Omnibus Motion *in Limine* is **GRANTED IN PART AND DENIED IN PART**.

## V. CONCLUSION

In sum, the Court **GRANTS** Plaintiff's Motion *in Limine* to Exclude Causation Testimony from Dr. Neil Silverman and Dr. Harold Wiesenfeld, **DENIES** Plaintiff's Motion *in Limine* to Limit Cumulative Expert Testimony, **DENIES** Plaintiff's Motion *in Limine* to Limit Neil Silverman M.D.'s Testimony Regarding Standard of Care, finds that Plaintiff's Motion *in Limine* to Limit Dr. Coleen Cunningham's Testimony Regarding the Standard of Care is **MOOT**; and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Omnibus Motion *in Limine* as follows:

- The Court will **exclude** testimony, comments, questions, arguments, and suggestions that N.D.'s mother was comparatively negligent.

- The Court will **exclude** testimony, comments, questions, arguments, and suggestions that Plaintiff failed to mitigate damages by delaying or otherwise failing to take appropriate steps in facilitating N.D.'s HIV treatment.

- The Court will **exclude** testimony from experts about what they (or their partners or associates) would have done in this case or what they have done with similar patients.

- The Court will **defer** to trial ruling on evidence of good character and comments on uncalled witnesses.

- The Court will **exclude** testimony, comments, questions, arguments, and suggestions to that effect CHSS made a good faith judgment between acceptable alternative medical treatments.

- The Court will **exclude** testimony, comments, questions, arguments, and suggestions that CCHS is sympathetic or apologetic as to N.D.'s being born HIV positive.

- The Court will **exclude** testimony, comments, questions, arguments, and suggestions that CCHS's experts are "the best" or any similar attempt to vouch.

**IT IS SO ORDERED.**

/s/ Jan R. Jurden

Jan R. Jurden, President Judge

cc:    Prothonotary